Good afternoon, Honorable Judges. May it please the Court, Richard Ackerman, on behalf of the Plaintiff and Appellant, Jim Friery. As was indicated before, some time has passed since we all met with each other last time, and progress has been made in the jurisprudence that we have on race relations. We have Gratz, we have Grutter, and we have the Parents Involved case. I think that in looking, in review of all those cases, in looking at where we are today, I don't think that the LAUSD policy fares any better than it did when we were here four years ago. We're still left with the conclusion that somebody can be precluded from applying for a position simply because they were born to the wrong mother, simply because of the melanin percentage in their skin, simply because we've reached a critical mass in terms of the number of white versus non-white applicants that we have. Well, look, in 25 words or less, how do you get around Parents Involved? Teachers are different. Well, yeah, but the educational mission isn't. And if the educational mission is, as it is, self-described, placing importance on the value of diversity, then why isn't the interest equally compelling, whether you're a student or you're a faculty member? I actually think I can sum that up. I taught in a minority school for 10 years, and sometimes examples are the best way to get to a solution. I was thinking on the way here, I'm always telling my staff I love appellate work because I don't need to deal with the clients, and it takes the humanity out of it. But what I do know from teaching in a minority school and having grown up in a poor household with a blind mother in a minority neighborhood myself is that had I been precluded simply because of my race when I went to apply at Santa Ana College to teach to those students, it would have been a disaster. Because I did grow up in a minority neighborhood, I was able to relate to those students on a much different level. But what I had going for me was I had the qualification of a study in philosophy at the undergrad and graduate level. I came to it with a law school education plus all of the experience, all of the things that were talked about in Gratz and Grutter, the ability to demonstrate. Well, counsel, I think we understand the general principles, but I think we really have to focus on the two issues that are in front of us. Number one, what does Prop 209 or Section 31 tell us so far as any state constitutional issue is concerned? And then, as you've indicated, that where do we stand with respect to the federal claim in light of Grutter, Gratz, and more specifically, which is now Ninth Circuit precedent, the new decision in parents involved. So if you could focus your remaining presentation, if you don't mind, on those specific issues, I think we'd be very... Absolutely. What Prop 209 tells us is... Before you get into that, though, on getting back to Judge Reimer's question on parents involved, you say teachers are different. What in the record of this case or in case law would indicate that we could use that as a principle by which we could distinguish parents involved? Well, that's just the problem with this case is Mr. Friery never got to a place aside from his race to be able to talk about those things. Well, you're maintaining a facial challenge, though. No, I think that as we look through the record, there were questions about its application and its facial validity. In its application, we ended up with a problem in terms of you're the wrong ethnicity or wrong ethnic origin, whatever the terms were, and then we have the LAUSD policy itself as it stands on its face and the issues about whether or not it can be modified at some future point in all of those issues. Well, let's take them one at a time. On the facial challenge to the policy, how do you distinguish parents involved on the basis of the record or case law? Well, on its face, and getting back to the answer that I tried to give Judge Reimer, is that parents involved, again, dealt with a student-based policy. LAUSD's policy on its face is about teachers. There's no doubt about that. It talks about qualifications, which is something that the policy in Washington would not have needed to have talked about because simply by being in the district, being within its boundaries, you're qualified to attend one of the schools. The LA district policy affects both teachers and students, whereas the Seattle policy affected students only. Is that correct? That's more or less true, that there was more of a direct correlation between LAUSD's reasons for doing what it was because of students, but in this particular situation with the union's involvement and the agreement that we have in place, plus Crawford, we know that this was really directed at teachers, especially with respect to Mr. Priory. When you say qualifications, I'm not quite sure I understand what you mean, because he had a job. I mean, so it wasn't ... That's not part of the mix for the policy, is it? No, I don't think that's true. A plus or minus? Okay. Because he was trying to transfer to magnet program, and for example, if he were a homosexual male, knowing what we know about discrimination and the evolution of progressive law on the issue of suspect classes and everything else, he would have been precluded regardless of what he could have contributed. Well, we have enough problems with this case without trying to worry about one that doesn't exist. We heard that on the record. This case affects all humans. I think that's the point. Yeah, but there's nothing in the record that I remember. That was from 2002. Yes, Your Honor. There's nothing that I remember that shows that the qualifications to teach at the magnet school were any different, or decisions were made, decisions about transferring there, teaching there, were different. It is true that there's a paucity of evidence with respect to qualifications, but again, I'm afraid to stop the analysis. Okay. Getting back to Prop 209. Well, before you leave that, let me clear up two things. One, is your client still employed by the district? I honestly don't know. I was called to argue this case just a couple of days ago. So we don't know whether this is moot or not. I don't know if Mr. James would be able to address that, but I don't. I must say, Counsel, from where I sit, the fact that an attorney is representing someone whose status he is unaware of is not very helpful to the court. My understanding is that he was still employed as of last I heard, which was in a conversation about a month or two ago with my former office. So we'll find that out. The second question I have was, I guess, based on my concerns at the prior hearing, which I satisfied, but now you've raised again as to standing. He did not apply for a transfer. He inquired about a transfer. We have a case, Mattson v. Boise State, that says in order to make an as-applied challenge that you have to follow through, you have to apply for a transfer and be denied. Otherwise, you don't have standing to make that challenge. And in the prior case, prior hearing, I thought, he'll say, no, no, no, we're just asserting a facial challenge. And I would suspect he might have standing on that basis. But now you're saying, we need more evidence in the record. We need to put in evidence. We're maintaining both a facial and an as-applied challenge. So tell me why your client has standing to make an as-applied challenge when he didn't apply for the position. A, he didn't get a chance to apply. And I think that falls squarely within Gratz and Grutter with their acknowledgment that, for example, if I walk into a restaurant as a minority and I say, may I have a meal here I'm willing to pay, and they say, no, you need to leave because you're a minority, I don't need to sit and speculate about the money. That's a totally different deal because here you had to apply for a transfer. So he runs it by the principal. The principal says you're not ethnically correct. And he curls up and doesn't take it any further. So we don't know, do we, what would have happened had he actually put in an application for transfer? My reading of Gratz and Grutter suggests that if, as I had indicated the last time I was here with Judge Thomas, I think that my reading of the law in getting into oblivious Northeastern cases is the offenses in the fact that he was told that he's the wrong ethnicity in the context of applying for a particular position, and that is enough to cause an actionable injury. So you're saying he did apply? His asking to apply for the position is, I'm sorry, I'm not drawing a fine enough distinction there. I apologize, Your Honor. Well, do we know who actually, to whom actually an application would go or who actually makes the decision? My understanding is it would have been processed through Mr. Thomas, Principal Thomas, the gentleman that we did have involved here, Thompson, Russ Thompson. And that that would have been the first step in order to get to the application process, and that's why he had gone to the principal in the first place. Is there any place we can look to find that in the record? I, without being able to quote to an exact page, I do believe that at least in Would it be in the policy or be in some kind of procedural manual or what? I mean, it doesn't particularly make sense to me that your own boss would be the person who would decide whether you could transfer to a different school. I mean, it strikes me that it would probably be somebody slightly above the principal. Maybe not. I don't know. Well, as much as I might be inclined to just say, well, it doesn't matter that the principal said this and completely precluded somebody from even thinking about a position because of their race, I'm inclined to say that grats and grudges still get us to the conclusion that that in of itself was an actionable form of conduct in terms of having a policy that was in place that was applied to this individual in a specific manner that resulted in a racist decision that was based solely on race in the context of an employment decision. However, you know, Judge Rimer is asking pretty specific questions and you're answering answering her by talking about Supreme Court precedent. I understand your argument, but I guess we don't know the facts at all in this case. Is that what you're saying? No, I don't think that's true. So who would have had the authority to grant the transfer? That would have been at the district level, I suspect. What does that mean? I don't understand. In looking at the allegations of the complaint as unchallenged, when we look at the excerpts of the record, I believe it's page four where we talk about the capacities of the parties. It does talk about the fact that he went to Russ Thompson and it's reasonably inferred from there and was not challenged by the district that that was the person to go to in terms of having the capacity to deal with the issue about him wanting to apply for that particular position. Specifically, paragraph 12 on ER 4, it talks about the fact that Plaintiff had gone to Thompson for permission to apply for and transfer to a position he had learned had become available at Van Nuys High School. Thompson would not let Plaintiff apply for a transfer and denied Plaintiff's request on the ground that Plaintiff was white. That reasonably infers and was never challenged by the district that there was an issue about needing to go directly to Thompson. Thompson is the one who held the permission and that's not disputed. Let me ask you this. The standing issue hasn't really surfaced. I mean, we're mainly the ones who are surfacing it. My question is whether, given that there is some degree of question about it, it makes sense to remand to the district court for an opportunity to consider whether to invalidate a school district policy under either the federal or the state constitution. I think that enough standing is that there's a critical mass for that, but there is standing, as I think was indicated by Thomas, at least arguably for the facial challenge, and I don't think that it would make any sense to send it back and remand without some indication as to how the policy itself fares as against grads, grutter and parents involved. And again, I think that that is a substantial issue in this case, is how does that policy on its face, knowing that it was applied and intended to apply to teachers in this case, fare in terms of where we are, even if we had some issues as we did in the situation with Washington where there was expert testimony and there were a number of things that we don't have in this case. The bottom line is that there was a backdrop against which the parents involved in bank decision could look at grutter, look at grads and say, all right, we've got this policy in front of us and now we have a fully developed factual record, but they weren't prevented from being able to address the policy itself, and I don't think that this court would be either, respectfully. With those... Assuming there is standing, just for the sake of argument, from your point of view, is your I think it is particularly strong on 209 and the grutter case. Grads, I think, presents with a slightly different situation. Well, yes, but unfortunately, from your point of view... Oh, I know. ...it exists too. No, I... And so does parents involved spin or extension of it? Well, I think the problem with parents involved, again, is we're not talking about just sort of a group that's defined by simply demographic or population changes or migratory behaviors of humans. This is a very directed thing when we're talking about a teacher applying for a position based on his or her qualifications, making the decision to go to a particular district. It's not comparable to the types of socioeconomic factors that we're talking about with student populaces when deciding which school to go to, and you've got an open door policy that says, well, you can apply to any one unless we get to race as a critical factor. I don't think that's what we have here. All right, well, let me ask you about being very specific now with respect to the Prop 209 aspect, at least the state constitutional claim. Section 31D of Article I, which is the incorporation of Prop 209, has an exemption for preexisting court orders, and there is a 1981 desegregation plan. I guess my question to you is, to what extent does that affect the state constitutional claim? Well, I think it affects it to the extent that we know from the record and the supplemental excerpts of the record that the court had requested with respect to the order itself and looking at Crawford, that any compliance after the term that was specified by OCR was completely voluntary, and there was nothing that prohibited them from adopting a plan that would have or could be consistent with the principles stated in Grutter and Gratz and yet still not offend that prior order, which is now only voluntary. Well, apart from the voluntary aspect of it, is it your contention that the order applies both to students and teachers or just to students? I think that the overriding policy that OCR was concerned about and that the court in ultimately did apply to both because they wanted to see desegregation at all levels. The policy we're talking about here has been in effect for 20 years or so in the L.A. school district, right? Yes. How does Prop 209 touch that because it only affects acts that have been taken after the effective date, late 1997? I think that that's essentially a balance of powers issue. I think that it would be strange to have a situation where there'd been a number of court orders or consent decrees within, let's say, two or three years prior that had an overview period of five, ten years to give it an opportunity for desegregation to take place. I'm not talking about consent orders. I'm talking about the policy of the district itself. The policy of the district itself at issue here has been in effect in one form or another for 20 years. What Prop 209 says on its face is that this section shall only apply to action taken after the section's effective date. Now, doesn't that preclude your facial challenge? No. And as a matter of fact, I think that the fact that it had been in existence for 20 years actually suggests that 209 should have much more of a strong effect against it in light of the jurisprudence that we now have on the issue. It shows its inflexibility. It shows its inability to meet the standards. What does that provision mean? If it had been intended to be retroactive, then that section would have been removed or would have said it's effective immediately and applied retroactively. It says it's only applied to action taken after the section's effective date. This policy was in place before the section's effective date. Now, as to your as-applied challenge, that may be different. But to your facial challenge, I think by the terms of Prop 209 itself, your facial challenge is precluded. I think the court, if I recall correctly, in Coalition for Economic Equality did address that issue and said that if we treat the policy as essentially having effective law and we have a law that's later in time, precedence, preference should be given to that law that's later in time, and we've got the will of the people, which can't simply be disregarded because we had a policy that's now otherwise unconstitutional for 20 years. I'm not talking about the will of the people. I'm talking about the will of the people in adopting the section that says it applies prospectively. That's part of 209. It's not part of the old Constitution. 209 is adopted by the people of the state of California. And 209 was intended to affect change, not to allow an existing but not required racist policy to continue existing simply because it was there. There was no requirement to continue engaging in these racist practices and policies. Counsel, you're down to about one minute. Do you wish to reserve? I would like to do that. Let me do so. Thank you. Let's hear from the school district. Thank you, Your Honor. Peter James for the school district. Mr. Quinones, who represents the union, is here as well, and we've agreed that he may have five minutes of the time if he chooses to take it. You have 20 minutes total. Whichever way you like to allocate is fine. May it please the Court. I'm prepared to bring you up to date. Mr. Friary was, as of two or three days ago, a teacher at Van Nuys Senior High School, and I am certain that I would have heard if something had happened in the last two or three days. All right. Thanks for checking, and thanks for being prepared to answer the question. The program guidelines would prohibit his transfer to the Van Nuys Math Sciences Magnet because of the composition of that school's faculty. Now has that composition changed at least to the extent that we should be made aware of it or perhaps have the case remanded for further examination or not? I don't believe so, Your Honor. I was going to give you a little bit more information on that. The faculty at the Van Nuys Math Sciences Magnet is 65 percent white. The faculty at the Van Nuys Performing Arts Magnet, a much smaller school, is 100 percent white. The faculty at the third Van Nuys Magnet, which just slipped my mind, is 75 percent white. To the extent that further information is needed to supplement the record, I would be glad to do so in written form, but what is apparent is that the ability of the district to go beyond the guidelines, if appropriate skills are needed, at least has been exercised to some extent. I think that that may not be a basis for decision on this, but it is an important part of our presentation. Give us a point of reference. These numbers, 65, 75, 100, what is the base number that would affect this? In Performing Arts, both of the teachers are white. In the other medical magnet, six of the eight teachers are white. No, I meant, isn't there a district-wide norm? Oh, I'm sorry. And it has changed slightly, yes, Your Honor. All right. Tell us about that. Thank you. The district minority faculty percentage is now 55 percent, and so the policy would permit between 40 percent and 80 percent. And so each of these magnet schools at Van Nuys are outside the policy limits. A 40 to 80 percent minority. Correct. Explain to me the transfer policy of the district, and leave out for the moment that this involves a magnet school. I mean, what procedure do you have when someone wants to transfer a school? What requirements are there apart from the policy and with the policy, and how does that transfer request, how is that transfer request processed? Your Honor, part of that is, part of the answer is in the record, and part of it is not. What is in the record is that the position was posted that plaintiff appellant went to Russ Thompson, who was then his principal, not the principal at the magnet school, and asked about transferring, and was told that he was the wrong ethnicity, and so he did not apply for the job. But it is vetted, and the application is made through personnel. So someone wants to transfer just because I assume it's public record somewhere in a document. A teacher would go first to his principal and ask to be transferred? No, not necessary. All right. Who makes the transfer decision? Well, one applies, and then it is done through personnel, and frankly, I haven't pursued it to find out which person is or was the person involved, but it's not done by Mr. Thompson. I see. And it's not, and it's done, as I understand it, with a consultation of the principal at the receiving school. Magnet school. Magnet school. The guidelines are guidelines adopted by the board. The procedure for... By the board being the board... Of education. Of the whole district. That's correct. And the procedure is that if the guidelines would bar the transfer, one has to look at and involve the principal of the receiving school about the particular characteristics of the applicant or the particular needs of the school. So if the guidelines... This comes up most frequently, quite frankly, as in math and science teachers, which are short supply. Sure. You take somebody with a specialty, and they're applying, and they don't fit within the guidelines, I gather the school policy allows for exceptions. That's correct. That's correct. Now, in terms of an ordinary transfer, I assume that someone has to meet the qualifications. They are entitled to bump. They are entitled to... There has to be an opening. That's correct. And it's based on seniority, I suppose, you would consider. And it's based on seniority, assuming some of the other features that we've just been discussing. Your Honor, two cases have been filed in state court that I think this court needs to know about. They are facial challenges, not only to this program, but also to the Magnet School program and the so-called PWT, Permits with Transportation program, both of which are race-based programs, both of which originated with the Crawford Remedy court order. One of those cases is currently active. The other case, the one that deals with the teacher program, has been stayed pending the resolution of this case. Is that the one we got the notice about? That is correct. That is correct. Pacific Legal Foundation representing, which is an intervener here, have brought both of those cases. They are currently assigned to two judges. If a stay is lifted, I think a likely prediction is that they will be either consolidated or coordinated. Because of this court's request for certification, which was exceedingly well-written and which included all of the issues, including, quite frankly, one that I wish you hadn't included. Well, you're very nice to compliment us. On the other hand, it was not effective, was it? It didn't work. On the other hand, it had one unique characteristic that was different than all of the others we found on Alexis. All of the others have the paragraph that says, in essence, that if the Supreme Court of the state refuses certification, this court will use its understanding or its prediction of how the Supreme Court of the state would rule. That's not present in this certification. I suspect it may be inadvertent, but if one is studying the record very closely, I think you're inclined to at least inquire about things like that. It included a point, as I say, that we wish you hadn't. And that is a point we think was decided in Bolin versus San Bernardino School District. And that is that transfer of teachers among schools in the district does not constitute discrimination. This is the question under the Federal Constitution, which is somewhat different from the question under Section 31. I agree with that, Your Honor. But the certification, of course, was under state law, and I think that issue had been resolved under state law. However, this program is, in the jargon that has been used, a reshuffle program. It seems to me that the cases that we have been talking about since original oral argument were all stack deck programs. Well, the California landscape, I think, hasn't changed basically at all. I think you're right, Your Honor. And in shorthand, I mean, the California Supreme Court still sticks to its statement in high voltage that preferential treatment and discrimination mean what they sound like they mean. And Section 31 does not have qualifiers like the federal law does for compelling interests or any of that stuff. Just if it discriminates on the basis of race, well, it just does. And then you add into that the Huntington Beach Crawford case, posing to you the opposite side of the question to Mr. Farley's counsel, in 25 words or less, how do you get out of that? I think quite easily, Your Honor. Those cases, the state cases, are stack deck cases. Well, they have stacked the deck against you. No, I don't think so. I think that when we're talking simply about someone having the same position, getting the same benefits, same seniority at one location or another, particularly in this instance, when it's on the same campus and maybe using the same parking space, it's not something that rises to the level of either discrimination or preference. I recognize that the majority opinion in high voltage said we'll define these or we'll use the normal definition of these terms. But that was not an issue in that case. The issue in that case was in an obviously stacked deck program, does the practical matter, though, in the figures you just gave us a minute ago, I mean, how much more would the deck have to be stacked? I mean, the guy can't conceivably get in, period, end of it, on account of his race. Isn't that right? Or did I mishear you? No, what I was saying... I mean, there are two people there and they're both white. He can't get in. That's all. Now, the faculty at the Mass Sciences Magnet is 20. And that's the one he's... That's the one he had applied to, yes. And something would have to happen. That's right. Some of the faculty would have to change. But that happens on a regular basis at schools. Well, is your argument on that, if I'm understanding your argument, you're just saying an ordinary transfer in the school district just doesn't implicate in these policies. And then if it's a shuffle policy, he's getting the same treatment. So it's not preferential treatment. Is that your argument? That is my argument. Yes, sir. Now, how does that fit in with the Magnet school concept? I mean, I understand that argument perfectly in terms of transfers between schools of equal caliber. How does that fit into the Magnet school situation? If you're talking about students, it doesn't. Well, teachers, too. Oh, no. All right. So let's take students first. Where I was going with that is both the student applications to Magnet schools and student applications to PWT are race based. And our defense as to those which are not in this case, this is only a faculty case, are being brought in the state court and will be based on some of the things that this court has raised already. Subpart D of Section 31, one of the things that we're quite clear that we will be able to show in the state court is that the Los Angeles district was not intended to be Proposition 209. On the other hand, as a whole, as a whole. Quickly, what theory? The easiest way to demonstrate it is to look at the voter information that is attached as an appendix to high voltage. And you will see that the legislative analysts said that that some volunteer programs could be affected and the state may, if they are and if they're they're dissolved, save 60 million dollars. At that point, and that's the point we have to examine, at that point, the state was paying the Los Angeles district somewhat over 400 million dollars for its desegregation program. And the legislative analysts knew this. This was conveying to the public that the voluntary programs scattered throughout the state would be covered and that the Los Angeles district would not. That's not part of the record here. You wanted to keep the money, basically. We are very definitely want to keep the money. We want to keep the programs. They are. But Section A, 31A, speaks to public employment, public education or public contracting. And presumably this is either education or employment. I agree. All right. I agree. But but you're. Attempting an overlay over that language with respect to the recitals in the background materials at the time. That's that that was the one I focused on because I thought it was the easiest. Your Honor, our argument there will be that there is no in the in the faculty programs, there is no preference or discrimination. And in the magnet school and PwT programs where there is a race based admission that is permitted under subpart D. But as between public employment, public contracting presumably is not effective, but as between employment and education, which one of those two concepts would apply in this case? I think education. All right. Very good. But just to make sure I understand your argument, are you are you contending that the fact that a magnet school is involved makes no difference in terms of the faculty as opposed to students? I mean, it's obviously the idea of a magnet school is to afford an additional benefit. Yes, Your Honor, to students. We we think it does make a difference. We think it makes a difference because the school wouldn't exist without the Crawford order and that it is by its nature a desegregation tool. This California Supreme Court on at least two occasions has said that the way you identify a segregated school is not only student race and ethnicity, but also faculty. I'm running short on time.  Because these issues are pending, both in the faculty sense and in the student sense in the state court, and because we have, Your Honor, raised the issue of standing in our response to the court's request for a briefing in Gratz and Grutter, we believe that this court ought to follow the suggestion, although not in Gratz and Grutter, but perhaps also in Scott versus Pasadena Unified School District, and either stay this case pending the resolution of the California law issues in the California courts, because they will go up, or to affirm on a lack of standing ground and then allow the issues to be resolved in the California courts. Here's our problem that the court approaches it differently. This case will be binding on us in the California courts where the issues ought to be decided if this court rules against the district. We've tried our best to let the California courts decide it. Well, my reading on high voltage suggests that there may be a little bit too much electricity in that case to have them take on another one, but that's... On the other hand... I'm suggesting we abstain. I'm suggesting you abstain. I'm suggesting you abstain or stay. And I think that these cases... I could use one other question. Is there a difference in the qualification broadly used for a magnet school teacher in Friary's position? No, Your Honor. So he could, without needing any additional kind of qualification, have been transferred? I believe that's correct, Your Honor. If this policy weren't in existence, there wouldn't be any inhibition upon... Let's put it this way. There is nothing in the record to suggest that he has or asks the district to consider any special skills that would cause the district to go beyond the policy. Go beyond the numbers of the policy. Well, that's not exactly what I ask. That's not what I ask. Does teaching at the magnet school require a skill set that doesn't necessarily exist for a regular high school? Not in the physical education department, Your Honor. Well, that's... Yeah, that's it. Okay. In other ways, yes? Certainly. I mean, in some of the magnet schools, for example, the easiest one to understand is the music and entertainment magnet, where the instructor has to bring some of those skills if he or she is teaching in that area. Counselor, you're down to less than two minutes. Did you want to share time with Ms. Cornelius or not? I did. And I thought I tried to grab it at five, but I didn't do a very good job. I apologize. Our questions kept you from your plan. I'm sorry. Good afternoon. May it please the Court, Jesus Quinones, Kefner and Bush for United Teachers Los Angeles. I just wanted to briefly support the district's position with respect to the federal and state law issues in this case. I do think that it's significant that there wasn't an actual application here because there wasn't an opportunity to determine if, in fact, the person that was selected might have had, for example, more seniority under the collective bargaining agreement, whether there were exceptions that could have been applied here. The policy itself in the excerpts of record refers to getting advice from cluster administrators, which are administrators that are above the local principle. And none of that occurred here because of the lack of an application. But I don't think there's any objection to his application or to his interest in the transfer from the union, is there? Was there any union complaint or challenge? No. No, there wasn't. And the union wasn't asked to intervene in any way. Normally, if he felt aggrieved, he would have talked to you. That's right. That's right. That's correct. But, you know, and so I want to point that out. I also want to suggest that you do have the possibility here. What I think should occur here is that you should decide this case, guided by parents involved, on the federal question, and that you can choose to abstain on the state law issue, which is a novel and complex issue. There are these cases pending in the state court. And I would suggest that that... So are you and the district in conflict on that point? I don't think we're in conflict. I think it's consistent with the view that we allow the state courts to decide this novel and complex issue on the state law issue, but that you decide the federal question in terms of parents involved. Let me ask one quick question. I know it's over time. I know it may not be in the record, but just for my understanding, are faculty members at Magnet schools paid more than faculty members at other schools or not? They are not. Okay. Thank you, counsel. We will hear from Mr. Ackerman. You have just about a minute. Thank you so much. And again, I'd like to apologize for not having contacted my client in the last two or three days. I sincerely apologize for that. Aside from that, I think that the district's reliance on Bolin is slightly misplaced and gets directly to one of the questions raised by Judge Thomas. In Bolin, what we were dealing with were orders from OCR that were not yet rescinded. They were unrescinded, as it were. Here, we've got a situation, again, getting back to that issue about voluntary compliance, simply ratifying something that you'd done before in light of Article 1, Section 31's provisos dealing with that issue. The other thing that causes me concern about abstaining, and I'm tending to agree with the union in this case, is I think the federal issue should be dealt with. I don't want to leave my client, although I haven't talked to him in a little while, but what I don't want to do is leave that injury swinging in the wind. I think that the issue needs to be dealt with. I don't want to have to come and revisit you in a few years. I think we've got enough substance before us in the record and in the facts that we do have to be able to address whether that policy on its face can be compared to something akin to, although this is a very bad example, of a sign that simply said, no blacks outside the admissions door. Counselor, let me make sure I understand. The union's position is different from the district's position to this extent. They would like a ruling on the federal claim now and not reach the state claim. Is that what you're saying, too? I am essentially saying that. I think that it addresses the, you know, when you do appellate work, you get, again, removed from that client, just like I sort of found myself in when you asked me about when I, did I last talk to my client? The one thing I know is, is that he's still thinking about this policy. He's still affected by it, and he's still waiting for whatever remedy or lack of remedy. But he still hasn't applied for it. Well, again, that gets back to, is this policy the same as putting up a sign that says, no blacks allowed? In his view, in the view of the record, I think that that's what that sign, that policy did communicate to him through Thompson, an official within the school district. And with that, I submit anyway. Thank you, Counsel. Thank you. The case just argued will be submitted for decision and the court will adjourn. Thank you. Have a wonderful day.
judges: O'scannlain, Rymer, Thomas